DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

AMY G. DENERO,                    )
                                  )
              Plaintiff,          )
                                  )
         v.                       )        Civil No. 2013-73
                                  )
PALM HORIZONS MANAGEMENT, INC.    )
d/b/a CATERED TO VACATION HOMES,  )
and J-MACKS PROPERTIES, LLC       )
                                  )
              Defendants.         )
_____ )

ATTORNEYS:

**Karin A. Bentz, Esq.**
**Gregory Adam Thorp, Esq.**
Law Offices of Karin Bentz, P.C.
St. Thomas, VI
     *For Amy G. Denero,*

**Ryan C. Meade, Esq.**
**Kyle Waldner, Esq.**
Quintairos, Prieto, Wood & Boyer, P.A.
Miami, FL
     *For Palm Horizons Management, Inc. d/b/a Catered To*
     *Vacation Homes and J-Macks Properties, LLC.*


**<u>MEMORANDUM OPINION</u>**

     Before the Court is the matter of Amy G. Denero against J-Macks Properties, LLC, and Palm Horizons Management, Inc. doing business as Catered To Vacation Homes.

**I.   <u>FACTUAL AND PROCEDURAL HISTORY</u>**

     In 2011, Amy G. Denero ("Denero") went on vacation to St. John, United States Virgin Islands.  She and five others stayed in Avalon Villa, which is owned by J-Macks Properties, LLC, ("J-

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 2

Macks"). J-Macks operates Avalon Villa as a vacation rental.

Palm Horizons Management, Inc. d/b/a Catered To Vacation Homes

("Palm Horizons") is the rental agent and property manager of

Avalon Villa.

J-Macks and Palm Horizons entered an agreement for property

management services which states, *inter alia*, that Palm Horizons

will

> [i]nsure that the home is ready for occupancy by
> incoming guests and that the agreed upon
> amenities are in place . . . . Provide a once a
> week house check when the property is vacant. .
> . . Contact and schedule house cleaners,
> gardeners, exterminators, and repair and
> maintenance persons. Contract and pay for, from
> the management account, cleaning fees, repairs .
> . . .

(ECF No. 213-2 [Property Management Agreement].) The agreement

also states that "We [Palm Horizons] will work with Three D

Maintenance . . . for all minor projects . . . minor renovations

and rebuilds. . . . [The contractor] is available to us [Palm

Horizons] for the general maintenance issues that our in the

field maintenance crew may not have the time, tools, or

expertise for . . ." (*Id.*) Finally, the agreement states that

"the owner [J-Macks] will keep the home and furnishings in good

repair: replace and/or repair household items as necessary . .

." (*Id.*)

Avalon Villa had a set of steps located between the dining room and living room. The steps did not have a handrail.  Denero states that the steps were constructed of stone, and did not have grips or treads on them.  She also claims that the steps have "shallow footholds."

On the fourth day of her vacation, when moving from the dining room to the living room, Denero fell down the steps. She landed on her left knee on the stone floor.  Denero alleges that she injured her left leg and ankle, and was unable to move for 45 minutes following the fall.  One of Denero's traveling companions was a doctor.  She states that the doctor in her group examined her and advised that she had not broken anything. Denero did not seek any other medical assistance at the time. Denero alleges that, due to her injuries, she was unable to enjoy the remaining four days of her vacation.

Denero returned home to Santa Cruz, California on October 11, 2011.  Thereafter, on October 14, 2011, she received medical attention at El Camino Hospital in Mountain View, California. There, Denero was diagnosed with a left distal femur fracture and a sprained ankle.  Denero claims that the doctor in Mountain View recommended surgery to repair the fracture as there was significant displacement of the fracture.  Surgery took place on Denero's injuries on October 14, 2011.

Denero alleges that, as a result of the injuries she sustained in Avalon Villa, she required three nights in the hospital, four nights in a skilled nursing facility, and four months of physical therapy.  Denero also claims that she was on disability from work for just short of six months following the injury. She alleges that the surgery and recovery required her to use approximately 120 hours of paid time off, sick leave, and education leave. Finally, Denero alleges that the fall has exacerbated a pre-existing degenerative disk disorder in her back.

Denero filed her Complaint in this matter on July 26, 2013. The Complaint was amended on November 7, 2014. The Amended Complaint contains two counts. Count One alleges negligence and gross negligence against Palm Horizons, for failure to correct an "obvious, dangerous condition." Count Two alleges negligence, and gross negligence against J-Macks, for failure to correct an "obvious, dangerous condition." Palm Horizons and J-Macks appeared, and were represented by the same counsel, the law firm Quintairos, Prieto, Wood & Boyer ("Quintairos").

Palm Horizons and J-Macks moved for summary judgment on April 6, 2015. Palm Horizons argued, *inter alia*, that it was not a possessor of Avalon Villa, and as such owed no duty of care to Denero. In essence, Palm Horizons' defense is that only the

owner can be liable to Denero, and that the record owner is J-Macks. J-Macks argued that failure to install handrails or slip-resistant treads on the stairs did not breach any duty owed to Denero. J-Macks also asserted that Denero does not know the precise cause of her fall, and as such had not adduced evidence that would allow her to proceed to trial.

The Court reviewed Palm Horizons' and J-Macks's motions for summary judgment, and particularly Palm Horizons' assertion that if anyone is liable it must be J-Macks. Out of an abundance of caution, On May 15, 2015, the Court, *sua sponte*, through the Magistrate Judge, raised the issue of whether or not there was a conflict of interest here between defendants Palm Horizons and J-Macks.  Thereafter, the Magistrate ordered counsel for the defense to file a memorandum of no more than five pages, with appropriate authorities, regarding any potential conflict. Defense counsel filed a three-page memorandum which included two citations, neither of which supported the assertions contained in the memorandum.

On June 5, 2015, the Court again ordered briefing, this time from both parties, on the issue of whether there was a conflict pursuant to Model Rule of Professional Responsibility 1.7 ("Rule 1.7"), as adopted by the Virgin Islands Supreme Court as Virgin Islands Rule of Professional Conduct 211.1.7. The

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 6

parties were instructed to support their arguments with
appropriate citations to authority with special attention to be
paid to Rule 1.7. Counsel for Denero filed a fourteen page
brief, with citations to authority, asserting that there was an
unwaived conflict. Counsel for the defendants submitted a six-
page brief that contained no citations to relevant authority in
its analysis.[1]

Quintairos argued that: 1) J-Macks cannot delegate its duty
as the possessor of the property, and as such has no claims
against Palm Horizons; and 2) that both J-Macks and Palm
Horizons are covered by J-Macks's insurance, and as such there
is no conflict.

The Court held a hearing on the issue of whether there was
a conflict in this case and, if so, whether that conflict was
waivable and was properly waived. Following that hearing, the
Court found that there was a conflict, due to the differing
positions of each defendant. The Court also found that there had
not been informed consent given by the parties such that the
conflict was waived.  Finally, the Court found that even had the
waiver shown there was informed consent, the conflict in this

---

[1] There was a *pro forma* inclusion of the text of Rule 1.7.  No caselaw or
analysis based on that rule was cited to, however.

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 7

case was such that it was not waivable. This opinion
memorializes the rationale for the Court's findings.

## II.  **DISCUSSION**

"The district court's power to disqualify an attorney
derives from its inherent authority to supervise the
professional conduct of attorneys appearing before it." *United
States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (citations
omitted); *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 131 (2d Cir.
1976) (noting that the district court has a "duty to supervise
members of its bar"). The Third Circuit has explained that

> [a]n attorney who fails to observe his
> obligation of undivided loyalty to his client
> injures his profession and demeans it in the
> eyes of the public. The maintenance of the
> integrity of the legal profession and its high
> standing in the community are important
> additional factors to be considered in
> determining the appropriate sanction for a Code
> violation.

*International Business Machines Corp. v. Levin*, 579 F.2d 271,
283 (3d Cir. 1978) (citing *Hull v. Celanese Corp.*, 513 F.2d 568,
572 (2d Cir.1975)).

"The maintenance of public confidence in the propriety of
the conduct of those associated with the administration of
justice is so important a consideration that [the Third Circuit]
ha[s] held that a court may disqualify an attorney for failing
to avoid even the appearance of impropriety." *Id.* (citations

omitted). "Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification." *Id.* (citations omitted); *see also HealthNet, Inc. v. Health Net, Inc.*, 289 F. Supp. 2d 755, 759 (S.D.W.Va. 2003) ("[C]ourts determining whether to disqualify counsel should act to prevent the appearance of impropriety and resolve doubts in favor of disqualification.") (citing *United States v. Clarkson*, 567 F.2d 270, 273 n. 3 (4th Cir.1977)); *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1083 (S.D.N.Y.1989) ("Although courts should pause before depriving a party of the counsel of its choice, disqualification is appropriate when a lawyer's conduct might taint the case. In general, then, a district judge should disqualify the offending counsel when the integrity of the adversarial process is at stake.") (citing *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)).

"[T]he exercise of th[e] authority [to disqualify] is committed to the sound discretion of the district court." *Miller*, 624 F.2d at 1201. Furthermore, "in its order of disqualification the [district] court has a wide discretion in framing its sanctions so as to be just and fair to all parties involved." *International Business Machines Corp.*, 579 F.2d at 279.

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 9

### III. <u>ANALYSIS</u>

Virgin Islands Rule of Professional Conduct 211.1.7 states

that

>  (a)Except as provided in paragraph (b), a lawyer
>  shall not represent a client if the
>  representation involves a concurrent conflict of
>  interest. A concurrent conflict of interest
>  exists if:
>
>  >  (1) the representation of one client will be
>  >  directly adverse to another client; or
>
>  >  (2) there is a significant risk that the
>  >  representation of one or more clients will be
>  >  materially limited by the lawyer's
>  >  responsibilities to another client, a former
>  >  client or a third person or by a personal
>  >  interest of the lawyer.
>
>  (b) Notwithstanding the existence of a
>  concurrent conflict of interest under paragraph
>  (a), a lawyer may represent a client if:
>  (1)the lawyer reasonably believes that the
>  lawyer will be able to provide competent and
>  diligent representation to each affected
>  client;
>
>  >  (2)the representation is not prohibited by
>  >  law;
>
>  >  (3)the representation does not involve the
>  >  assertion of a claim by one client against
>  >  another client represented by the lawyer in
>  >  the same litigation or other proceeding
>  >  before a tribunal; and
>
>  >  (4) each affected client gives informed
>  >  consent, confirmed in writing.

Virgin Islands Rules of Professional Conduct 211.1.7 ("V.I. Rule

211.1.7"). In interpreting the professional obligations of

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 10

attorneys, the Virgin Islands courts have looked to the American
Bar Association's model rules, on which the Virgin Islands'
rules were based. *See, e.g.*, *Matter of Maynard*, 60 V.I. 444,
2014 WL 201952 (citing to model rule 1.7 in evaluating attorney
behavior). Thus, the Court first considers if there is either
direct adversity between two or more clients or a significant
risk of material limitation on the lawyer's advocacy due to the
lawyer's relationship with multiple clients.  Then, if there is
a conflict, the Court must determine if the conflict could be
consented to.  Finally, if the conflict could be consented to,
the Court must determine whether or not there was informed
consent given by all affected clients.

   Here, the Court must determine if there was, in fact, a
conflict in representing both Palm Horizons and J-Macks.

> [A] lawyer asked to represent several
> individuals . . . is likely to be materially
> limited in the lawyer's ability to recommend or
> advocate all possible positions that each might
> take because of the lawyer's duty of loyalty to
> the others. The conflict in effect forecloses
> alternatives that would otherwise be available
> to the client. The mere possibility of
> subsequent harm does not itself require
> disclosure and consent. *The critical questions*
> *are the likelihood that a difference in*
> *interests will eventuate and, if it does,*
> *whether it will materially interfere with the*
> *lawyer's independent professional judgment in*
> *considering alternatives or foreclose courses of*
> *action that reasonably should be pursued on*
> *behalf of the client.*

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 11

Rule 1.7 (comment 8)(emphasis added). "[S]imultaneous representation of parties whose interests in litigation may conflict, such as coplaintiffs or codefendants, is governed by paragraph (a)(2). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." *Id*. (comment 23).

Disqualification of a party's chosen counsel is a serious matter which cannot be based on imagined scenarios of conflict. *See Richmond Hilton Associates v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir.1982) ("actual or likely" conflict of interest required). Thus, the moving party bears a "high standard of proof" to show that disqualification is warranted. *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978). The high standard of proof is fitting in light of the party's right to freely choose counsel, *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 753 (2d Cir. 1975), and the loss of time and money incurred by the parties in being compelled to retain new counsel. *See Government of India*, 569 F.2d at 737. However, the right of one to retain counsel of his choosing is secondary in importance to the Court's duty to maintain the highest ethical standards of

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 12

professional conduct to insure and preserve trust in the integrity of the bar. *Silver Chrysler*, 518 F.2d at 757; *Hull v. Celanese Corp.*, 513 F.2d 568, 569 (2d Cir.1975).

In looking at the record in this case, several things are apparent.  First, J-Macks owns the property on which Denero suffered her injury. Second, Palm Horizons was the property manager for the property where Denero suffered her injury. Third, there was a contractual agreement between J-Macks and Palm Horizons assigning various responsibilities for the property to each. Palm Horizon's duties included inspecting Avalon Villa to ensure it was ready for guests. (ECF No. 213-2.) Employees for Palm Horizons testified that they would inform the property owners if repairs had to be made. (ECF No. 218-5, Francis Dep., 13:10-17, 14:10-15.) J-Macks's duties included keeping "the home and furnishings in good repair . . . ." (ECF No. 213-2.)  There was deposition testimony that repairs costing less than $10,000 could be done by Palm Horizons independently, and all other repairs had to be approved by J-Macks. (ECF No. 218-2, Russell Dep., 31:4-17.)

This factual scenario presents conflicting positions. Palm Horizons is entitled to argue, and indeed does so argue in its motion for summary judgment, that it is not a possessor of the property and therefore cannot be liable as a matter of law. The

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 13

accusation, quietly contained therein, is that the property

owner, J-Macks, is the possessor. Quintairos conceded at the

hearing that Palm Horizons contends J-Macks is the possessor and

noted that J-Macks was not disputing as much. That is, Palm

Horizons can and indeed is arguing that to the extent any

liability exists, that liability is J-Macks's alone. Palm

Horizons would also be entitled to argue, as part of its

defense, that its contract with J-Macks did not require Palm

Horizons: (1) to inform J-Macks about areas that Palm Horizons

thought required repair; or (2) to independently undertake

repair work.

J-Macks, on the other hand, is certainly entitled to argue

first that Palm Horizons was the possessor of the property, for

purposes of tort liability. *See Williams v. Martin Marietta

Alumina, Inc.*, 817 F.2d 1030, 1034 (3d Cir. 1987) ("An

independent contractor is in possession of the necessary area

occupied by the work contemplated under the contract and his

responsibility replaces that of the owner who is, during the

performance of the work by the contractor, out of possession and

without control over the work or the premises.")  If Palm

Horizons were the property possessor, and not merely an

independent contractor, J-Macks could absolve itself of all

liability for Denero's injuries as a matter of law. If J-Macks

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 14

is the possessor, it could be liable for the acts of its independent contractors or agents on the property. In that scenario, J-Macks is also entitled to argue that its agreement with Palm Horizons allows it to seek indemnity if Palm Horizons' negligent repair or inspection is found to have caused Denero's injury. *See, e.g.*, *Kirschbaum v. WRGSB Associates*, 243 F.3d 145, 151-53 (3d Cir. 2001)(analyzing a contract between property possessor and property manager to determine if the negligence occurred in an area the property manager was responsible for, thereby entitling the possessor to indemnification).

The majority of these positions, which logically might assist each defendant in exonerating itself from liability, have not been asserted in this matter.  Indeed, of those listed above, only Palm Horizons' argument that it is not a possessor and thus cannot be held liable has been put forth. These potential different defenses present substantially different possibilities of settlement of the claims and liabilities in question.

Furthermore, the factual evidence on record will almost certainly lead, at trial, to Quintairos cross-examining its own party-witnesses. It is likely that Denero's counsel will inquire about each party's responsibilities in making repairs to Avalon Villa.  Indeed, in order to properly establish the parties'

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 15

liabilities Denero's counsel must do so. Furthermore, Denero's counsel has represented that she intends to ask the employees of Palm Horizons whose responsibility it was to repair defects at Avalon Villa. Assuming those individuals answer in conformity with their depositions, the answer will be, "J-Macks." At that point, counsel for J-Macks and Palm Horizons will be in an impossible position. For their defense of J-Macks, a cross-examination of that statement would be necessary to exonerate their client. Indeed, the deposition of J-Macks's corporate representative indicates that J-Macks believes repairs costing less than $10,000 were the responsibility of Palm Horizons. (ECF No. 218-2, Russell Dep., 31:4-17.) On the other hand, such an act would damage Palm Horizons' case. To act for one would harm the other. This is the very definition of a conflict of interest.

Quintairos argues that such conflicts are hypothetical, as they have not asserted any defenses in which one defendant is "pointing the finger" at the other. That is not clear on the record before the Court. As a factual matter, Palm Horizons asserts that it cannot be liable as it is not the possessor of Avalon Villa. This assertion was reaffirmed at the hearing. Legally, Palm Horizons asserts that only the possessor can be liable for negligence in these circumstances. Quintairos

reiterated this legal argument again at the hearing. However, these factual and legal assertions do not exist in a vacuum. They imply that J-Macks is the possessor and may legally be liable for negligence. It carries with it the argument that, to the extent any party is liable to Denero, it must be J-Macks.

"An actual conflict exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *United States v. Rico*, 51 F.3d 495, 509 (5th Cir. 1995)(internal quotation omitted). As a legal matter, an actual conflict already exists. First, Palm Horizons has already asserted that it is not the possessor. That assertion, whether intended or not, points any potential liability to its codefendant, J-Macks. Furthermore, direct adversity between the two defendants is imminent at trial once counsel for Denero begins its inquiry regarding which party bore the duty of inspecting the villa and which bore the duty of repairing the villa. Adducing evidence from one defendant that the other was obligated to either report or repair defects in the property would exculpate one defendant at the expense of the codefendant.

"Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 17

conflict of interest. A concurrent conflict of interest exists

if [] the representation of one client will be directly adverse

to another client [] or there is a significant risk that the

representation of one or more clients will be materially limited

by the lawyer's responsibilities to another client[.]" V.I. Rule

211.1.7. Here, it is clear from the record that there is a

significant risk that representation of both of these clients in

the same action will materially limit Quintairos's ability to

fulfill its responsibilities to each defendant.

Indeed, that risk seems to already have been realized. At

the hearing on this issue, Quintairos seemed to have never

contemplated that either defendant might have claims against the

other. Instead, it appears that Quintairos has staked out a

defensive position that it believes is the best position for the

defense side of the case taken as a whole. It does not appear

that Quintairos has at all considered, or appreciates, how the

assertion of those positions could affect the ability of *each*

individual defendant to defend itself. The summary judgment

papers similarly indicate that the majority of these defenses

were neither developed nor pursued.

This scenario is analogous to that in a case from the

Eastern District of Virginia, *Sanford v. Virginia*, 687 F. Supp.

2d 591 (E.D. Va. 2009). In *Sanford*, John Charles Sanford

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 18

("Sanford") was a patient at a hospital in the Virginia

Commonwealth University hospital system (the "Hospital"). The

Hospital gave him a medication which made him delirious. *Sanford*

*v. Virginia*, 687 F. Supp. 2d 591, 594 (E.D. Va. 2009). In

response to Sanford wandering the halls in his delirium, the

Hospital called the police. *Id*. The police allegedly wrestled

Sanford to the ground, handcuffed Sanford, and held Sanford

prone. *Id*. A nurse administered the sedative Haldol. *Id*. After

holding Sanford handcuffed and prone for thirty minutes, the

officers and nursing staff at the hospital discovered Sanford

had died. *Id*.

Sanford's estate and several of his relatives (the

plaintiff) filed suit against a number of Hospital doctors,

Hospital nurses, and several police officers. The police

officers all shared one attorney. Similarly, the doctors and

nurses all shared an attorney. *Id*. at 596. One doctor, Dr.

Meguid, among other things, was alleged to have been aware that

Sanford should not be given Haldol. *Id*. at 600. Dr. Meguid was

also alleged not to have properly communicated to other Hospital

personnel that Sanford should not be given Haldol. *Id*. Two

members of the nursing staff and another doctor ("Dr.

Maiberger") prescribed and then administered Haldol to Sanford.

*Id*. Dr. Meiberger did not see Sanford before prescribing Haldol.

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 19

Rather, Dr. Meiberger prescribed Haldol based on a nurse's description of Sanford's behavior. *Id.* at 601.

The district court noted that this factual scenario, adduced through deposition testimony, presented conflicting positions. *Id.* It further noted that neither Dr. Meiberger nor the nurses asserted that Dr. Meguid had failed to properly notify them of the risks of using Haldol on Sanford, the position that logically might exonerate them from liability, if supported by evidence and accepted by the jury. *Id*. Finally, the district court noted that, as negligence depended on a showing of what a reasonably prudent person (in this case, doctor) would do, the nursing staff's representations to Dr. Meiberger, if erroneous, might exonerate him. *Id.* The district court found that, though these defenses were unasserted, they were positional and pertinent to settlement issues. *See, e.g.*, *id*. ("It seems rather clear that the defense of Dr. Maiberger requires a showing that his conduct was reasonable in perspective of the information that he was given by Nurse Brown. And, of course, if that information was wrong, then Dr. Maiberger would have a defense, the existence of which would require the lawyer defending Dr. Maiberger to point at Nurse Brown's inadequate information as a means of exonerating Dr. Maiberger. That evidence would point necessarily, in an

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 20

inculpatory fashion, to Nurse Brown. That conflict is positional

and is pertinent to settlement issues.")

    In discussing the United States Court of Appeals for the

Fourth's Circuit's caselaw on the matter of conflicts, the

district court noted that

> disqualification simply cannot be based on mere
> speculation that a chain of events whose
> occurrence theoretically could lead counsel to
> act counter to his client's interests might in
> fact occur. The applicable rule requires
> disqualification when the independent
> professional judgment of the lawyer is likely to
> be affected. Accordingly, some stronger
> indicator than judicial intuition or surmise on
> the part of opposing counsel is necessary to
> warrant the drastic step of disqualification of
> counsel.

*Sanford*, 687 F. Supp. 2d at 603 (internal citations and

quotations omitted). With that in mind, the district court

concluded

> As explained above, the conflicts that are
> presented here are real conflicts. They exist
> now and they have existed throughout the course
> of the case. They have significant impact on the
> conduct of the trial respecting how best to
> serve the interests of the individual defendants
> who are affected by the extant conflicts.
>
> Furthermore, the conflicts here raise the
> serious prospect that the trial could fall into
> disarray. This prospect has actually manifested
> itself in the motions for summary judgment
> presented by the defendants and in the
> presentation of expert testimony, including
> several contentions of law and opinion favoring

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 21

the interest of one defendant while presenting
the prospect of real harm to others.

It is obvious from reviewing the motions for
summary judgment and the expert opinions that
counsel, both for the VCUPD officers and the VCU
medical defendants, have staked out defensive
positions that they think are the best positions
for the defense side of the case considered as a
whole. It does not appear, however, that counsel
have considered, or that they appreciate, how
the assertion of those positions could affect
the ability of each individual defendant to
defend herself or himself by presenting
arguments that other defendants are really
responsible for Sanford's tragic death even
though another defendant may have had some
involvement in the circumstances leading up to
that death. Nor do the summary judgment papers
indicate that these potential individual
defenses have been developed or pursued.

*Id.*

As in *Sanford*, very few conflicting defenses have thus far

been raised. Indeed, only one of these defenses has been pursued

at the summary judgment stage. Though not raised in summary

judgment, all of these defenses would be available at trial.

However, no attorney representing both defendants would be able

to pursue all such defenses, a fact which Quintairos conceded at

the hearing. Advocating for one client would certainly damage

the other. The failure to take advantage of these options and

opportunities, in addition to the likelihood of having to cross-

examine one's own party-witnesses, would inculpate one client

while trying to exculpate the other. That circumstance "creates

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 22

an appearance of impropriety in a multiple representation even
if the motivation for doing so is the notion that somehow to
eschew the best defense for each individual defendant presents
the best defense for the group of clients considered as a
whole." *Id.* at 604. As such, an actual conflict exists here.

Having determined there is a conflict, the Court next
considers if that conflict is waivable by the defendants. A
conflict can be waived if: (1) the lawyer reasonably believes
that the lawyer will be able to provide competent and diligent
representation to each affected client;(2) the representation is
not prohibited by law; and (3) the representation does not
involve the assertion of a claim by one client against another
client represented by the lawyer in the same litigation or other
proceeding before a tribunal. V.I. Rule 211.1.7(b).

Given the likelihood of having to cross-examine their own
party-witnesses, the Court finds that a reasonable lawyer would
not believe that he or she would be able to provide competent
and diligent representation to each affected client in this
case. Though Quintairos accurately states that these defendants
have filed no cross-claims against each other, the current
evidence indicates that at trial they will be in the same
position as though they had. Furthermore, Quintairos's complete
failure to appreciate the different positions the defendants

find themselves in indicates that the demands of serving both

clients in a way that avoids such conflicts makes diligent and

competent representation of both difficult in the extreme. An

attorney could not reasonably think that a position requiring he

or she forgo all individual defenses without even considering

them would allow diligent or competent representation.

Furthermore, even if an attorney could reasonably believe

he or she could provide competent representation despite this

conflict, "each affected client" would have to "give[] informed

consent, confirmed in writing." V.I. Rule 211.1.7. This has not

happened here. "[T]o waive a conflict, [Rule 1.7] requires not

just consent, but informed consent, which is defined as

agreement by a person to a proposed course of conduct after the

lawyer has communicated adequate information and explanation

about the material risks of and reasonably available

alternatives to the proposed course of conduct." *Matter of*

*Maynard*, No. S.CT.CIV. 2013-0011, 2014 WL 201952, at *3 (V.I.

Jan. 17, 2014).

> Ordinarily, this requires communication that
> includes a disclosure of the facts and
> circumstances giving rise to the situation, any
> explanation reasonably necessary to inform the
> client or other person of the material
> advantages and disadvantages of the proposed
> course of conduct and a discussion of the
> client's or other person's options and
> alternatives. The more experienced the client is
> in legal matters generally and in making

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 24

> decisions of the type involved, the less
> information and explanation is needed for a
> client's consent to be informed. When dealing
> with a client who is independently represented
> by other counsel in giving the consent,
> generally the client should be assumed to have
> given informed consent.

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d

390, 396-97 (N.D. Tex. 2013).

At the time of the hearing and the Court's order, only a

single document on the record relating to consent was on the

docket. That document was two pages long, with one page

consisting of the header and signature block. That document, in

essence, simply stated the procedural and very basic factual

nature of the case. The document then went on to conclude, with

no discussion or analysis, that Quintairos did not believe there

was a conflict. Finally, the document "confirms the agreement"

of both J-Macks and Palm Horizons and stated that both agreed to

waive any conflict of interest arising during the course of

representation. The document appears to have been sent to the

defendants on June 5, 2015, the date the Court entered its order

scheduling the hearing on the issue of conflict.

At the hearing, Quintairos represented to the Court that:

(1) defense counsel had had discussions with the defendants at

the outset of the case to tell the defendants about their

defenses, including the arguments presented in the motions for

summary judgment, and to allow the defendants to appreciate the positions advanced on their behalf; and (2) that the defendants had been represented by independent counsel in considering the document called a "waiver" by Quintairos. It was later brought to the Court's attention by Palm Horizon's independent counsel that independent counsel for Palm Horizons had not provided any such advice to Palm Horizons and that Quintairos may have violated its duty of candor to the Court. See V.I. Rule 211.3.3 (Candor Toward the Tribunal)[2] As such, the Court must balance Quintairos's representations along with the subsequent disclosures from Palm Horizons' independent counsel. On balance the representations of Quintairos suffer.

There is no record evidence that any informed consent took place here. As of the date of the hearing and this opinion's accompanying order, there was nothing on the record to suggest that the parties were at any point apprised of what they were potentially forfeiting when they agreed to a joint defense. As Quintairos appeared to not have considered or developed potential individual defenses by the time of the hearing, it seems quite unlikely they were shared as possibilities with the defendants themselves. Though Quintairos has submitted

---

[2] A determination of whether the Quintairos attorney at the hearing violated Rule 211.3.3 will be addressed in a separate opinion.

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 26

additional materials since the hearing that it submits waive the

conflict in this case, such documents also fail to apprise the

defendants of their options in such a way that the Court

believes these particular conflicts were waived. The burden of

proof, on the issue of informed consent, is on the attorney

seeking to represent two conflicting parties. *See Galderma*

*Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 398

(N.D. Tex. 2013). Quintairos failed to meet that burden here.

Even if this conflict was waiveable, it was not properly waived.

As the conflict in this matter cannot be consented to, the

only issue left for the Court to decide is the remedy.

> The Third Circuit has often employed a balancing
> test in determining the appropriateness of the
> disqualification of an attorney. In *Int'l
> Longshoremen's Ass'n, Local Union 1332 v. Int'l
> Longshoremen's Ass'n*, 909 F. Supp. 287
> (E.D.Pa.1995), the court set forth the factors
> to be balanced: (i) the former client's interest
> in attorney loyalty, (ii) the current client's
> interest in retaining his chosen counsel, (iii)
> the risk of prejudice to the current client, and
> (iv) the court's interest in protecting the
> integrity of the proceedings and maintaining
> public confidence in the judicial system.

*De La Cruz v. Virgin Islands Water & Power Auth.*, No. 1:07-CV-9,

2012 WL 1648318, at *2 (D.V.I. May 8, 2012)(internal citations

and quotations omitted) *aff'd*, 597 F. App'x 83 (3d Cir. 2014).

"[T]he courts have gone so far as to suggest that doubts as to

the existence of an asserted conflict of interest should be

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 27

resolved in favor of disqualification." *Int'l Bus. Machines*

*Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978).

In this case, the defendants both went through discovery

with current defense counsel. Those attorneys were thus the

recipients of confidential information. The duty of

confidentiality would not permit those attorneys to share the

confidences of one defendant with the other. However, the duty

of loyalty and to provide diligent representation to one client

might require using information it received from the other, now-

former, client. This presents a serious roadblock to the

possibility of disqualifying counsel from representing only one

of the parties now that conflict has been discovered. Indeed, it

is for these reasons that, "[o]rdinarily, the lawyer will be

forced to withdraw from representing all of the clients if the

common representation fails." Rule 1.7 (comment 29).

Quintairos argues that Rule 1.9, which governs an

attorney's duties to his former clients, does not require

disqualification from representing only one or the other of

these two parties going forward. This reliance on Rule 1.9 is

misplaced. First, contrary to Quintairos's assertion, the

interests of Palm Horizons and J-Macks are materially adverse.

Indeed, counsel for those two defendants is likely to have to

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 28

cross-examine the principals of the other entity. There is very little that is more directly adverse than cross-examination.

Second, the comments to Rule 1.9 expressly state "[n]or could a lawyer who represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among clients in that matter, unless all affected clients give informed consent." There is no record evidence to support a finding of informed consent as it relates to the possibility of counsel representing either J-Macks or Palm Horizons but not both going forward. Indeed, Quintairos concedes that counsel has had no discussions with either defendant regarding the concerns of representing one defendant while no longer representing the other.

Third, Quintairos ignores the Court's role in ensuring the integrity of its proceedings and maintaining public confidence in the judicial system. "When a court finds a violation of Rule 1.9(a), the public interest that may render disqualification appropriate may be at its zenith. Indeed, it is difficult to envision many cases in which a court would find a violation of Rule 1.9(a), yet also conclude that disqualification is not appropriate." *De La Cruz v. V.I. Water & Power Auth.*, 2012 WL 1648318, n. 3 (D.V.I. 2012)(citing *In re David Cutler Indus.*,

*Denero v. Catered To, Inc., et al.*
Civil No. 2013-73
Memorandum Opinion
Page 29

432 B.R. 529, 541 (E.D. Pa. 2010)). Given these considerations, the Court finds that disqualification is the appropriate remedy here.[3]

In addition to disqualification, Denero's counsel seeks monetary sanctions in the amount of $6,645. Denero's counsel represents that the amount sought represents the cost incurred by mediation and the change in trial date. Denero's counsel argues that because the mediation would have been in vain, due to the conflict, imposing those costs as sanctions against Quintairos is appropriate. The Court will refer the issue of what monetary sanctions, if any, are warranted to Magistrate Judge Ruth Miller.

## IV.   CONCLUSION

Although the Court recognizes the hardship to all of the parties, as well as to plaintiff's counsel, in making such a determination at this juncture of the litigation, the Court finds that Quintairos, Prieto, Wood & Boyer must be disqualified as to both J-Macks and Palm Horizons.

An appropriate order follows.

---

[3] Though Quintairos asks this Court to stay its ruling on the issue of disqualification until it rules on the now pending motion for reconsideration of the Court's finding that a conflict exists which cannot be consented to and was not consented to, the Court declines this invitation. This opinion is necessary to provide the very holding which the Court is asked to reconsider. As such, the motion for reconsideration cannot and will not be addressed without the availability of this opinion on the record.